Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelada<br><br>v.<br><br>DAVID LEE PAGÁN SANTANA<br><br>Apelante | KLAN202500379 | APELACIÓN procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Criminal Núm.: KEC2024G0025<br><br>Por: Art. 127 CP |
|---|---|---|

Panel integrado por su presidente, el Juez Pagán Ocasio, el Juez Rodríguez Flores y la Juez Lotti Rodríguez[1].

Lotti Rodríguez, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 27 de febrero de 2026.

El señor David Lee Pagán Santana (en adelante, señor Pagán Santana o apelante) mediante recurso de *Apelación* presentado el 23 de diciembre de 2025, nos solicita que dejemos sin efecto la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala de San Juan (en adelante, TPI o foro primario) el 8 de abril de 2025. Mediante ese dictamen, el foro primario impuso una pena de reclusión de diez (10) años por infringir el Artículo 127A del Código Penal 2012, 33 LPRA sec. 5186a.

Por los fundamentos que proceden a continuación, se **revoca** la *Sentencia* apelada.

### I.

Por hechos ocurridos el 20 de agosto de 2024, en el municipio de San Juan, el Ministerio Público presentó una (1) acusación contra el señor Pagán Santana por el delito de maltrato a una persona de edad avanzada. En particular, por el apelante haber

---

[1] Conforme a la OATA-2025-078 del 14 de mayo de 2025, la Hon. Glorianne M. Lotti Rodríguez sustituyó al Hon. Roberto J. Sánchez Ramos.

cometido una agresión al señor Ángel M. Pabón Lago, siendo este una persona de sesenta y nueve (69) años al momento de los hechos. Superados los trámites de rigor, el Juicio en su Fondo se celebró los días 15 y 22 de enero y 10 de febrero de 2025.

Durante el juicio, el Ministerio Público presentó los siguientes testigos: Ángel M. Pabón Lago, Janice Charris Pabón Rosaly y Agente Gretchen Marín Santana.

Por su parte, la Defensa presentó como testigo al acusado, el señor David Lee Pagán Santana y al Agente Ángel Bermúdez Figueroa.

Los testimonios y la prueba de cargo presentada en el juicio, la resumimos a continuación:

**1. Ángel M. Pabón Lago (en adelante, señor Pabón Lago)**

En juicio identificó al acusado como David Lee Pagán Santana, lo cual explicó que contrató sus servicios de mudanza, desde su antigua residencia en Cidra a los apartamentos de Paseo Monte en Cupey, San Juan.[2] Este sostuvo que para la fecha de los hechos tenía sesenta y nueva (69) años.[3] Explicó que, el 20 de agosto del 2024, llegó a su residencia en Cidra el señor Pagán Santana y dos (2) caballeros más.[4] Al señor Pagán Santana lo describió como un poco más bajo que él, ni gordo, ni flaco, fuerte, de cómo unos treinta y pico de años de edad.[5] Al llegar al apartamento de Cupey, los trabajadores comenzaron a bajar la mudanza, lo cual este se percató que algunas piezas estaban guayadas y medio rotas. [6] A preguntas del fiscal sobre las condiciones de dichas piezas, este aseguró que estaban en perfecto estado.[7] Ante ello, el señor Pabón

---

[2] TPO (22 de enero de 2025), pág. 8.
[3] TPO (22 de enero de 2025), pág. 11.
[4] Íd.
[5] TPO (22 de enero de 2025), págs. 11-13.
[6] TPO (22 de enero de 2025), pág. 15.
[7] TPO (22 de enero de 2025), pág. 16.

Lago esperó que se bajara la mudanza completa para "tocar el asunto".

Posteriormente, este le comentó al señor Pagán Santana que había observado que unas piezas que estaban rotas, por lo que, le gustaría saber cuál es el proceso para la reclamación a su seguro.[8] Este explicó que la reacción del señor Pagán Santana fue de indispuesto, que se notaba molesto y contrariado.[9] En respuesta, el señor Pagán Santana le exigió que le pague, a lo que este le respondió que le pagará cuando haga la reclamación al seguro.[10] Ambos siguen el intercambio, hasta que el señor Pagán Santana le admitió que dejó vencer el seguro.[11]

Acto seguido, el señor Pagán Santana levantó una mesa de madera sólida y se la llevó hacia afuera del apartamento.[12] En eso, sale del apartamento y este indicó que se le fue detrás, y cuando él pone la mesa en el piso, éste la coge. Luego que la levantó con sus dos (2) manos, la pone en forma de defensa porque sintió que el señor Pagán Santana estaba con una actitud violenta.[13] Este aclaró que fue con las patas de la mesa hacia el señor Pagán Santana para crear una distancia, ya que lo vio agresivo y quiso de esa manera defenderse. Indicó que entendió que el señor Pagán Santana estaba agresivo porque salió del apartamento con la mesa y amenazó con que se iba a lleva la mudanza completa.[14]

Luego, este explicó que violentamente el señor Pagán Santana le dio un puño a la mesa, lo cual le tumba la mesa de las manos y esta se cae en el piso.[15] Ante ello, este asumió una posición defensiva, porque pensó que el señor Pagán Santa lo iba agredir. La

---

[8] Íd.
[9] TPO (22 de enero de 2025), pág. 17.
[10] Íd.
[11] Íd.
[12] TPO (22 de enero de 2025), pág. 18, líneas 14-20.
[13] TPO (22 de enero de 2025), pág. 19, líneas 1-4.
[14] TPO (22 de enero de 2025), pág. 19, líneas 10-1
[15] TPO (22 de enero de 2025), pág. 19, líneas 26-29.

posición que asumió la describió como con "una mano en forma como de pare".[16] Eso, con el fin de mantener distancia, para que no le agrediera. Acto seguido, explicó que salió su hija, y cuando ella sale, el señor Pagán Santana se giró y le gritó a ella que este le agredió.[17] En ese momento, este perdió la concentración, porque no lo había ni tocado. Luego, miró a su hija y en ese momento el señor Pagán Santa le conectó dos (2) puños.[18] Ante ello, se cayó al piso y perdió la conciencia.[19]

Posteriormente, lo que recuerda fue que se levantó y su hija lo ayudó porque estaba botando sangre profusamente por la nariz. Dentro de todo, trató de llamar a seguridad del condominio, pero tenía tanta sangre que el teléfono se llenó de sangre. Por lo que, entonces fue a lavarse en el fregadero de la cocina para tratar de limpiarse un poco.[20] Al describir sus fracturas explicó que tenía unas abrasiones en el área del pecho y rodilla por haber caído al piso. También señaló la hinchazón en el lóbulo izquierdo, encima de la oreja, así como el golpe en ojo derecho, ya totalmente inflamado y parcialmente cerrado.[21]

En el contrainterrogatorio, explicó que estuvo dos días en el Hospital. A preguntas de la Defensa, expresó que desconocía si esos dos días se debieron a que médico el maxilofacial y oftalmólogo no aparecía para atenderlo. [22] Explicó que, levantó la mesa para defenderse porque el señor Pagán Santana se interpuso entre la puerta y él.[23]

**2. Janice Charis Pabón Rosaly (en adelante, señora Pabón Rosaly):**

---

[16] TPO (22 de enero de 2025), pág. 20.
[17] TPO (22 de enero de 2025), pág. 20, líneas 18-25.
[18] TPO (22 de enero de 2025), pág. 20, líneas 18-25.
[19] TPO (22 de enero de 2025), pág. 21, líneas 6-7.
[20] TPO (22 de enero de 2025), pág. 21, líneas 12-19.
[21] Íd.
[22] TPO (22 de enero de 2025), pág. 36.
[23] TPO (22 de enero de 2025), pág. 43.

Es la hija del señor Pabón Lago. Explicó que vio a los trabajadores bajar la mudanza y se percató que los muebles estaban guayados y con la tela esgarrada.[24] También, vio una butaca media rota, sillas de comedor rotas y guayadas.[25] Por tanto, esta le comentó a su padre que vio que algunos de los muebles estaban rotos.[26] Luego de que bajaran la mudanza, ella vio la interacción entre su padre y el señor Pagán Santana. Su padre le indicó al señor Pagán Santana que hay unos muebles que están rotos, por lo que, este le dice que tiene que responderle.[27] La respuesta del señor Pagán Santana fue un poquito más fuerte, al decirle, porqué tú me vas a echar la culpa a mí. Esta explicó que este empezó defenderse o a defender la situación. De ahí, pues su padre le dice: "mira yo no te puedo pagar, si no me resuelves lo de los muebles".[28] Y en esa dinámica, estuvieron hasta que su padre, le dice: "pero ven acá ¿tú tienes seguro? porque el seguro responde".[29]

El señor Pagán Santana le explicó que no podían porque era tarde y que lo hacían al otro día. A lo que entonces su padre le indicó que, si se va a hacer mañana, pues entonces que mañana le paga. Entonces, ella entró en la conversación, porque conoce gente en los seguros. Así que, le dijo al señor Pagán Santana que las oficinas de seguros no habían cerrado todavía. En adición que, si tiene un representante lo puede llamar en cualquier momento. En eso, el señor Pagán Santana le indicó a ella y a su papá que el seguro estaba vencido. A lo que entonces su papá nuevamente le dice que resuelva lo del seguro y luego le paga. En respuesta, el señor Pagán Santana le dice pues que se llevaría la mudanza.[30] Entonces, este cogió una

---

[24] TPO (22 de enero de 2025), pág. 57.
[25] Íd.
[26] TPO (22 de enero de 2025), pág. 58.
[27] TPO (22 de enero de 2025), pág. 60.
[28] Íd.
[29] Íd.
[30] TPO (22 de enero de 2025), págs. 60-61.

mesa de la sala y sale por el apartamento, a lo que su padre se le va detrás.

La testigo explicó que ella se quedó adentro del apartamento, mientras ellos salían del edificio. Luego, ella escucha un ruido como que algo cayó, un cantazo, un ruido fuerte. En eso salió del apartamento y abrió la puerta de cristal y automáticamente lo que se encuentra de frente, son a los dos (2) caballeros que acompañaban al señor Pagán Santana, luego que mira al piso y ve la mesa tirada y cuando se voltea hacia el lado izquierdo ve cuando el señor Pagán Santana le da a su papá. Luego, con el coraje esta le dice mil malas palabras a este, que era un abusador y que le va a llamar a la policía.[31]

En el contrainterrogatorio, expresó que su papá se enojó cuando le dijeron que se iba a llevar la mudanza para atrás.[32] Explicó que no vio el primer puño, pero sí vio el segundo puño que tumbó a su papá al piso.[33]

### 3. Agente Gretchen Marín Santana

Declaró que labora en la Policía de Puerto Rico desde hace once (11) años, y que lleva tres (3) años laborando en la división de agresiones, personas desaparecidas, drogas y propiedad. [34] Explicó que, tras recibir la querella de este caso, se comunicó con el señor Pabón Lago para que este acudiera a su oficina y así entrevistarlo.[35] El perjudicado, a quien entrevistó el 10 de septiembre de 2024, le narró haber contratado los servicios del apelante para realizar una mudanza desde Cidra al Condominio Paseo Monte en Cupey. Testificó que el señor Pabón Lago se percató de que los muebles no

---

[31] TPO (22 de enero de 2025), págs. 61-62
[32] TPO (22 de enero de 2025), pág. 70.
[33] TPO (22 de enero de 2025), pág. 75.
[34] TPO (10 de febrero de 2025), pág. 80.
[35] TPO (10 de febrero de 2025), pág. 81.

estaban en las condiciones que se recogieron, así que este y su hija le reclamaron estos daños al señor Pagán Santana.[36]

Luego, el señor Pagán Santana le confesó que su póliza de seguro estaba vencida, lo cual provocó un careo entre el perjudicado y el apelante.[37] Declaró que el perjudicado estuvo hospitalizado como una (1) semana, entre el Professional Hospital de Guaynabo y el Centro Médico de Río Piedras.[38] Luego de realizar múltiples gestiones para entrevistar personalmente al apelante, la testigo llevó a cabo una rueda de confrontación fotográfica en la cual el señor Pabón Lago identificó al señor Pagán Santana como la persona que lo golpeó.[39]

**Testigos de la Defensa:**

### 1. Agente Ángel Bermúdez Figueroa[40]

Explicó en cuanto al incidente que, el señor Pagán Santana le dijo, entre otras cosas, que:

> En eso pues él comienza a recoger la mercancía que fue una mesa, cuando sale él ve que el señor se le va detrás agresivamente, diciéndole mira puñeta no te vas a llegar ninguna mudanza. Entonces eh, la pers(sic) dice que don Ángel Pabón, y con esa, y se lanzó a él. Él se esquivó para que no le diera, puso sus manos para que no le diera. Pues entonces al ver, al ver el, la actitud del caballero, pues entonces, pues él pensó que la persona venía para encima a agredirlo, pues lo que hace, lo empuja, él lo empuja, él dice que el caba(sic) don Ángel Pabón cayó en los arbustos y se dio con la pared. Ahí entonces procede, dice a sus empleados, mira vámonos de aquí. Ellos se montan en el *truck*, le pide al guardia de seguridad que abra el portón, y se marchan.[41]

Declaró que no le tomó fotos a las manos del señor Pagán Santana porque no le vio ningún tipo de laceración, ni siquiera en los nudillos.[42]

---

[36] TPO (10 de febrero de 2025), pág. 82.
[37] TPO (10 de febrero de 2025), pág. 83.
[38] TPO (10 de febrero de 2025), pág. 85.
[39] TPO (10 de febrero de 2025), pág. 87.
[40] TPO (10 de febrero de 2025), pág. 100
[41] TPO (10 de febrero de 2025), pág. 102.
[42] Íd.

En el contrainterrogatorio, reconoció que había gotas de sangre en toda la escena y que la única persona golpeada era el señor Pabón Lago. Expresó que cuando visitó al perjudicado en el hospital, vio que este tenía el ojo derecho hinchado, así como también exhibía abrasiones en sus rodillas e inflamación en su mano derecha.[43] Admitió que no le vio ningún golpe al apelante.[44]

En el redirecto, declaró que el perjudicado y su hija ofrecieron una versión de los hechos que contradice lo que el señor Pagán Santana le manifestó durante la entrevista.[45] Atestó que, al realizar su investigación, entendió que la persona agredida era el señor Pabón Lago, ya que estaba herido.[46] Afirmó que no vio cómo ocurrieron los hechos.[47]

### 2. David Lee Pagán Santana.[48]

Es el acusado en este caso. Este explicó que entró a la propiedad a notificarle al señor Pabón Lugo que se van y que tiene realizar el pago, ya que tienen otros servicios de mudanza pendientes.[49] A lo que este le contestó que los muebles están guayados y le hace como un recorrido de los muebles. Este le contestó que ya eso estaba guayado.[50] Además, le dijo que ellos protegieron los muebles y que él estuvo presente y lo vio, y nunca se quejó.[51] Este le explicó que tiene que hacer el pago y que son $680 dólares. Asimismo, le sugirió que le hiciera querella porque lo que quería el señor Pabón Lugo era que le reemplazara los muebles nuevos.[52] Luego, este le negoció que le iba a reducir $300 dólares, ya que tenía que pagarle a sus empleados, a lo que el señor Pabón

---

[43] TPO (10 de febrero de 2025), págs. 105-106.
[44] TPO (10 de febrero de 2025), pág. 106.
[45] TPO (10 de febrero de 2025), pág. 107.
[46] Íd.
[47] Íd.
[48] TPO (10 de febrero de 2025), pág. 108.
[49] TPO (10 de febrero de 2025), pág. 114.
[50] TPO (10 de febrero de 2025), pág. 114.
[51] Íd.
[52] TPO (10 de febrero de 2025), pág. 115.

Lugo le contesta que no.[53] Y le repite que tiene que hacer lo del seguro porque si no va a llamar a la policía. Explicó que le hablaba en tono altanero y con sarcasmo, como con malicia.[54]

Acto seguido, el apelante le dijo que si no le va a pagar la mudanza pues la tendrá que devolver, aunque este tuviese que pasar doble trabajo.[55] Entonces, declaró que cogió una mesita del juego de sala y salió del apartamento con ella. Ante ello, el señor Pabón Lugo lo empezó a insultar de camino en el pasillo que era bastante largo.[56] Entre los insultos, le dijo "canto de cabrón, que no te vas a llevar la mudanza".[57]

Entonces, tan pronto este puso la mesa en el piso para abrir el cajón, el señor Pabón Lugo se la quita y la pone con patas hacia arriba, en dirección hacia él y se la tira.[58] Por eso, este trató de esquivar para el lado con los codos y se la tira para el lado.[59] Luego, el señor Pabón Lugo procedió a insultarlo y a decirle que no se va a llevar la mudanza, pero con los puños arriba, como si fuera a boxear.[60] Entonces cuando el señor Pabón Lugo iba hacia encima de él, pues trató de sacárselo de encima.[61] En eso, el perjudicado se tropezó con un muro blanco, el cual parecía un contador.[62] Explicó que el muro está en el pasillito que está la puerta, que es en forma de cuadrado y como rectangular aproximadamente como de cinco (5) a seis (6) pulgadas.

Ante ello, el señor Pabón Lugo se cayó de frente y se escuchó que se dio con la pared. Había unos arbustos y ahí el perjudicado cae.[63] En eso, este trató de ir a donde él para ayudarlo a levantarse

---

[53] TPO (10 de febrero de 2025), pág. 116.
[54] Íd.
[55] Íd.
[56] Íd.
[57] Íd.
[58] TPO (10 de febrero de 2025), págs. 116-117.
[59] TPO (10 de febrero de 2025), pág. 117.
[60] Íd.
[61] Íd.
[62] Íd.
[63] TPO (10 de febrero de 2025), pág. 118.

y ahí sale la hija gritando, "¡ah este váyanse de aquí! ¡Váyanse de aquí o les llamo la policía!", a lo que este le responde "dama él me agredió, dama él me agredió".[64] Acto seguido, llamó a los muchachos para que se fueran, aún sin cobrar porque temían por su seguridad por si tenía una pistola.[65]

Luego, el Agente Bermúdez lo retiene y el apelante le dice que por qué no entrevista a sus empleados que estuvieron presentes, a lo que le contestó que no hacía falta. Igualmente, el apelante le dijo que le tirara fotos a las manos, ya que estas no estaban marcadas, ni moretonadas, ni rotas.[66] Le dice que no hay problema, que no pasa nada.[67]

En el contrainterrogatorio, aclaró que el señor Pabón Lugo le dio con la mesa en el codo.[68] Además, explicó que al tratar de esquivar la mesa le dio en los codos.[69] Expresó que, lo empujó porque venía hacia él a darle. [70]

**Hasta aquí la prueba presentada en juicio.**

Así las cosas, el 8 de abril de 2025, el foro primario dictó *Sentencia* en la cual condenó al apelante a cumplir diez (10) años de reclusión por infringir el Artículo 127A del Código Penal de 2012, 33 LPRA sec. 5186.

Inconforme con el proceder del TPI, el 23 de diciembre de 2025, el apelante acudió ante nos mediante recurso de *Apelación* y señala los siguientes errores:

> Erró el Tribunal de Primera Instancia al declarar culpable al señor David Lee Pagán Santana cuando la prueba de cargo no estableció su culpabilidad más allá de duda razonable, en violación al derecho constitucional a la presunción de inocencia y el debido proceso de ley.

---

[64] Íd.
[65] Íd.
[66] TPO (10 de febrero de 2025), pág. 120.
[67] Íd.
[68] TPO (10 de febrero de 2025), pág. 122.
[69] TPO (10 de febrero de 2025), pág. 123.
[70] TPO (10 de febrero de 2025), pág. 127.

> Erró el Tribunal de Primera Instancia al declarar culpable al señor David Lee Pagán Santana, cuando la prueba de cargo resultó contradictoria con respecto a detalles importantes de cómo fue que sucedieron los alegados hechos. Siendo esto así, no se estableció más allá de duda razonable que el señor Pagán Santana haya agredido físicamente al supuesto perjudicado.

Oportunamente, el Pueblo de Puerto Rico, representado por la Oficina del Procurador General de Puerto Rico, presentó su alegato en oposición. En esencia, indicó que la prueba de cargo derrotó la presunción de inocencia del apelante.

**II.**
**A. La apreciación de la prueba**

Es norma conocida que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos no deben intervenir para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el foro primario. Regla 42.2 de Procedimiento Civil, *supra; Peña Rivera v. Pacheco Caraballo,* 213 DPR 1009, 1024 (2024); *Ortíz Ortíz v. Medtronic,* 209 DPR 759, 778 (2022); *Santiago Ortiz v. Real Legacy et al.,* 206 DPR 194, 219 (2021). Incurre en pasión, prejuicio o parcialidad el juez "que actúe movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que someta prueba alguna". *Ortíz Ortíz v. Medtronic, supra,* pág. 779 (citando a *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 782 (2013)). En cuanto al error manifiesto, este ocurre cuando el foro revisor está convencido de que se cometió un error "porque existe un conflicto entre las conclusiones y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". *Méndez v. Morales,* 142 DPR 26, 36 (1996).

Ahora bien, la llamada deferencia judicial está predicada en que los jueces del TPI "están en mejor posición para aquilatar la

prueba testifical porque tienen la oportunidad de oír, ver y apreciar el comportamiento del testigo". *Peña Rivera v. Pacheco Caraballo, supra,* pág. 1025 (citando a *Ortíz Ortíz v. Medtronic, supra,* pág. 779). De manera que, la norma general es que, si la actuación del TPI no está desprovista de una base razonable y no perjudica los derechos sustanciales de las partes, debe prevalecer su criterio dado que es a quien le corresponde la dirección del proceso. *Sierra v. Tribunal Superior,* 81 DPR 554, 572 (1959).

### B. La suficiencia de la prueba

La Sección 11 del Art. II de la Constitución de Puerto Rico, Tomo 1, reconoce como imperativo que, en todo proceso criminal, el acusado disfrute del derecho a la presunción de inocencia. En sintonía con nuestra Constitución, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, establece que "[e]n todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en todo caso de existir duda razonable acerca de su culpabilidad, se le absolverá". Por tanto, en nuestro ordenamiento jurídico para que una persona pueda ser declarada culpable de un delito, **esta debe demostrarse con prueba suficiente y más allá de toda duda razonable**, toda vez que constituye uno de los imperativos del debido proceso de ley. *Pueblo v. Irizarry,* 156 DPR 780, 786 (2002); *Pueblo v. De León Martínez,* 132 DPR 746, 764-765 (1993).

A esos efectos, el acusado no está obligado a presentar prueba alguna para defenderse, sino que simplemente podrá descansar en la presunción de inocencia que le asiste. *Pueblo v. Irizarry, supra,* pág. 787. Por ello, la absolución de un acusado debe partir de la consideración serena, justa e imparcial de la totalidad de la prueba desfilada o de la falta de prueba suficiente. *Íd.,* pág. 788. En esa línea, el juzgador(a) de los hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han

quedado establecidos o demostrados. Esto, con sujeción a los principios que recoge la Regla 110 de las Reglas de Evidencia, 32 LPRA Ap. VI, a saber:

> (C) Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza.

> (D) La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.

> .     .     .     .     .

> (H) Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Evidencia directa es aquélla que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente. Evidencia indirecta o circunstancial es aquélla que tiende a demostrar el hecho en controversia probando otro distinto, del cual por s[í] o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia.

Conviene mencionar que, nuestro Tribunal Supremo ha sido enfático a que la prueba del Ministerio Público "tiene que ser satisfactoria, es decir, prueba que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". *Pueblo v. Acevedo Estrada,* 150 DPR 84, 100 (2000); *Pueblo v. Rodríguez Román,* 128 DPR 121, 131 (1991); *Pueblo v. Narváez Cruz,* 121 DPR 429 (1988); *Pueblo v. Carrasquillo Carrasquillo,* 102 DPR 545, 552 (1974). De modo que, "la insatisfacción de la conciencia del juzgador con esa prueba produce lo que conocemos como duda razonable". *Pueblo v. Acevedo Estrada, supra,* pág. 100; *Pueblo v. Toro Rosas,* 89 DPR 169, 175 (1963).

Además, el que el foro primario haya hecho una determinación de culpabilidad, no impide que los foros apelativos, si tienen duda razonable, dejar sin efecto un fallo. En reiteradas ocasiones a nuestro más alto foro local no le ha convencido la prueba desfilada ante el foro de instancia, lo cual le ha producido

duda razonable sobre si la culpabilidad del apelante ha quedado establecida más allá de duda razonable y ha dejado sin efecto un fallo condenatorio. *Pueblo v. Carrasquillo Carrasquillo, supra*; *Pueblo v. Pagán Díaz, supra*; *Pueblo v. Meléndez Rolón,* 100 DPR 734 (1972); *Pueblo v. Falú Fuentes,* 102 DPR 809 (1974); *Pueblo v. Sanabria Pérez,* 113 DPR 694 (1983); *Pueblo v. Alamo Alamo,* 116 DPR 673 (1985).

Es decir, que hasta tanto "se disponga de un método infalible para averiguar sin lugar a duda dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia. Ese deber de conciencia no para en el fallo del tribunal sentenciador. Nosotros también tenemos derecho a tenerla tranquila". *Pueblo v. Cabán Torres,* 117 DPR 645 (1986) (citando a *Pueblo v. Carrasquillo Carrasquillo, supra,* págs. 551-552).

### C. Maltrato a personas de edad avanzada

La Ley Núm. 138-2014, mejor conocida como la *Carta de Derechos de la Persona de Edad Avanzada,* busca salvaguardar los derechos de las personas de edad avanzada en Puerto Rico. El Artículo 2(p) de la Ley Núm. 138-2014 define a la persona de edad avanzada como aquella que tiene sesenta (60) años o más. Esta ley busca promulgar y adoptar las medidas necesarias para detener y erradicar el maltrato y negligencia a personas de edad avanzada. Exposición de Motivos de la Ley Núm. 138-2014. Por tanto, es una pieza legislativa que da como punto de partida la promulgación y adopción estatutos cónsonos a la política pública de cuidar la vulnerabilidad de nuestros adultos de tercera edad. Íd. La cuál va dirigida contra todas aquellas conductas constitutivas de violencia familiar y relaciones abusivas, en específico contra las personas de edad avanzada. Íd.

En protección las personas de la tercera edad, el Artículo 127A del Código Penal, 33 LPRA sec. 5186a, incorporó por enmienda mediante la Ley Núm. 138-2014, *supra,* la siguiente disposición:

> Toda persona que, cometa abuso físico, emocional, financiero, agresión, robo, apropiación ilegal, amenaza, fraude, o violación, contra una persona de edad avanzada, causándole daño o exponiéndole al riesgo de sufrir daño a su salud, su bienestar, o sus bienes, será sancionada con pena de reclusión por un término fijo de diez (10) años. Artículo 127A del Código Penal, *supra.*

Igualmente, los artículos bajo esa Sección Tercera, Capítulo III — delitos contra la familia — del Código Penal sobre *la protección debida a las personas de edad avanzada e incapacitados*, responden a una protección mayor o más severa al delito original por la víctima ser una persona de la tercera edad. Véase, Arts. 125-129 del Código Penal, 33 LPRA secs. 5184-5186d.

**III.**

En el presente recurso, nos corresponde determinar si el foro primario incidió al declarar culpable al señor Pagán Santana, cuando la prueba de cargo no estableció su culpabilidad más allá de duda razonable, en violación al derecho constitucional a la presunción de inocencia y el debido proceso de ley. Además, si la prueba de cargo resultó contradictoria con respecto a detalles importantes de los hechos.

Ante tales señalamientos de error, conviene que reseñemos los hechos que surgen de la prueba de cargo, la cual se constituye de *Exhibits* y el testimonio de cinco (5) testigos.

Los hechos revelan que la controversia ante nuestra consideración tuvo su origen el 20 de agosto del 2024. Ese día, el señor Pagán Santana y otros dos (2) trabajadores, llegaron a la antigua residencia del señor Pabón Lugo en Cidra, para hacerle su mudanza desde allí, hasta Paseo Monte en Cupey, San Juan. Al llegar al apartamento de Cupey, el señor Pagán Santana y sus trabajadores comenzaron a bajar la mudanza. Mientras eso sucede,

el señor Pabón Lugo se percató que algunos muebles estaban guayados y medio rotos. No obstante, este no le dijo nada a los mudanceros hasta tanto se bajara la mudanza completa para entonces "tocar el asunto".

Una vez estos culminaron, el señor Pabón Lugo le manifestó al apelante sobre los muebles rotos y exigió que este le hiciera la reclamación a su seguro. En ese diálogo, el señor Pabón Lugo le explicó al apelante que no le va a pagar hasta que hiciera la reclamación del seguro. Acto seguido, el señor Pagán Santana levantó una mesa de madera sólida y se la llevó hacia afuera del apartamento.[71] En eso, el señor Pabón Lugo se le fue detrás, y cuando el apelante pone la mesa en el piso, este la coge y la pone con las patas hacia arriba en dirección al apelante. Hasta aquí, los testimonios coinciden entre sí sobre los detalles relevantes.

Ahora bien, tanto como el acusado como el perjudicado testificaron versiones contradictorias sobre cómo el señor Pabón Lugo resultó herido. Veamos.

Por su parte, el señor Pabón Lugo manifestó que el señor Pagán Santana le tumbó la mesa, por lo que, asumió una posición defensiva porque pensó que este le iba agredir. La posición la describió como "una mano en forma como de pare".[72] Acto seguido, explicó que salió su hija, y cuando ella sale, el señor Pagán Santana se giró y le gritó que este lo agredió.[73] En ese momento, este perdió la concentración, porque no lo había ni tocado. Luego, miró a su hija y en ese momento el señor Pagán Santa le conectó dos puños.

De otro lado, la versión del apelante es que luego que el señor Pabón Lugo le quitara la mesa, este se la pone con las patas hacia arriba, en dirección hacia él y se la tira.[74] Ante ello, el apelante trató

---

[71] TPO (22 de enero de 2025), pág. 18, líneas 14-20.
[72] TPO (22 de enero de 2025), pág. 20.
[73] TPO (22 de enero de 2025), pág. 20, líneas 18-25.
[74] TPO (10 de febrero de 2025), págs. 116-117.

de esquivar la mesa para el lado y le da en los codos. Entonces, cuando el señor Pabón Lugo iba hacia encima de él, este trató de sacárselo de encima.[75] En eso, el perjudicado se tropezó con un muro blanco, el cual parecía un contador.[76] Este se cayó y se escuchó que se da con la pared.

En vista de lo anterior, nos corresponde, pese a tales versiones contradictorias, determinar si la prueba de cargo demostró más allá de duda razonable la culpabilidad del acusado.

Según el derecho reseñado, es sabido que, en todo proceso criminal el acusado disfruta del derecho a la presunción de inocencia. Véase, Sección 11 del Art. II de la Constitución de Puerto Rico, Tomo 1. Por tanto, el acusado no está obligado a presentar prueba alguna para defenderse, sino que simplemente podrá descansar en la presunción de inocencia que le asiste. El estándar de prueba necesario para que una persona pueda ser declarada culpable de un delito, **es el de más allá de toda duda razonable**. *Pueblo v. Irizarry, supra,* pág. 786.

En primer lugar, nos resulta inquietante la investigación realizada en el caso ante nos. El Agente Bermúdez Figueroa no le tomó fotografías a los muebles ni a la mesa que desencadenó el alegado forcejeo. Igualmente, este no le tomó fotos a las manos del señor Pagán Santana porque no vio ningún tipo de laceración, ni siquiera en los nudillos.[77] Tampoco corroboró si habían cámaras de seguridad en el lugar que ocurrió la escena. Peor aún, este no entrevistó a los s dos (2) mudanceros que estuvieron presentes en la escena cuando ocurrió el altercado.  Por ende, somos de la opinión, que no se hizo una investigación adecuada que permitiera corroborar lo que allí sucedió, antes de encausar y privar a un

---

[75] Íd.
[76] Íd.
[77] Íd.

ciudadano de su libertad. Es deber de los fiscales y agentes del orden público llevar a cabo una investigación indagatoria que incluya prueba que pueda beneficiar al acusado.

Además, merece nuestra atención que, el testimonio del señor Pabón Lugo y el de su hija son contradictorios entre sí. La señora Pabón Rosaly explicó **que no vio el primer puño, pero sí vio el segundo puño que tumbó a su papá al piso.**[78] Por su parte, el señor Pabón Lugo explicó que salió su hija, y cuando ella sale, el señor Pagán Santana se giró y le gritó a ella que este le agredió.[79] En ese momento, este perdió la concentración, porque no lo había ni tocado. Luego, **miró a su hija y en ese momento el señor Pagán Santa le conectó dos (2) puños.** Tal contradicción exacerba aún más nuestra inquietud sobre la certeza de lo que allí ocurrió.

De todo lo anterior, no nos cabe duda, que se no se probó más allá de duda razonable la culpabilidad del apelante. La evidencia desfilada en el caso es insuficiente e insatisfactoria, lo cual no cumple con el estándar de prueba requerido en procedimiento criminal. Resultaría jurídicamente insostenible que este Tribunal condenara a una persona a cumplir diez (10) años de reclusión, porque una persona resultó ilesa de un altercado, mientras que la otra resultó herida.

Recordemos que, porque el foro primario haya hecho una determinación de culpabilidad, no impide a este Tribunal dejar sin efecto un fallo si hay duda razonable. Según mencionamos, en reiteradas ocasiones nuestro más alto foro local no le ha convencido la prueba desfilada ante el foro de instancia, lo cual le ha producido duda razonable sobre si la culpabilidad del apelante ha quedado establecida más allá de duda razonable y ha dejado sin efecto un fallo condenatorio. *Pueblo v. Carrasquillo Carrasquillo, supra.*

---

[78] TPO (22 de enero de 2025), pág. 75.
[79] TPO (22 de enero de 2025), pág. 20, líneas 18-25.

Así pues, ante una investigación inadecuada, contradicciones de los testimonios presentados por el Ministerio Público e inconsistencias insubsanables, resolvemos que no se demostró la culpabilidad del apelante más allá de toda duda razonable.

**IV.**

Por las razones que anteceden, revocamos la *Sentencia* apelada.

Notifíquese.

Lo acordó el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones